JUDGE SCH

'08 CIV 7699

**ANDREW M. CALAMARI**
Associate Regional Director

**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
3 World Financial Center
New York, NY 10281-1022
Phone: (212) 336-0174

SEP -5 2008
U.S.D.C. S.D.N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,  :  Plaintiff,  :  v.  :  JULIAN T. TZOLOV and ERIC S. BUTLER,  :  Defendants.  : | 08 Civ. _____  COMPLAINT |

---

Plaintiff Securities and Exchange Commission (the "Commission') alleges:

## SUMMARY OF ALLEGATIONS

1. Defendants Julian Tzolov and Eric Butler, while registered representatives associated with Credit Suisse Securities (USA) LLC ("Credit Suisse"), made over $1 billion dollars of unauthorized purchases of auction rate securities for the accounts of corporate customers. Tzolov and Butler concealed these unauthorized purchases by making false and misleading statements to their customers about the nature of the securities Tzolov and Butler had purchased for the customers and the assets collateralizing them. These customers authorized Tzolov and Butler to purchase only auction rate securities backed by federally guaranteed student loans, which

Tzolov and Butler had promoted as low risk, highly liquid alternatives to investments like bank deposits, money market funds, and commercial paper. Instead, from at least February 2005 through August 2007, Tzolov and Butler purchased for these customers without authorization over $1 billion in auction rate securities collateralized by subprime mortgages, collateralized debt obligations ("CDOs"), mobile home contracts, and other non-federally guaranteed non-student loan collateral.

2.  To conceal their unauthorized purchases, Tzolov and Butler sent or caused to be sent to customers e-mails falsely stating or indicating that securities purchased for the customers were federally guaranteed student loan backed securities when they were not. Tzolov and Butler also sent or directed others to send e-mails to customers in which the names of the auction rate securities purchased for the customers were altered to conceal that the securities were CDOs or other auction rate securities collateralized by mortgages and other non-student loan collateral.

3.  In August 2007, most of the non-student loan backed auction rate securities that Tzolov and Butler had purchased became illiquid when auctions began to fail. As a result, several of Tzolov and Butler's corporate customers were stuck with at least $817 million in such securities that they did not want to buy and are now unable to sell. These securities also have lost significant value.

## VIOLATIONS

4.  By virtue of the conduct alleged in this Complaint, Tzolov and Butler, directly or indirectly, singly or in concert, have engaged in transactions, acts, practices, and courses of business that constitute violations of Sections 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(3)] seeking permanently to enjoin Tzolov and Butler from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint. The Commission also seeks a final judgment ordering Tzolov and Butler jointly and severally to disgorge their ill-gotten gains, if any, and to pay prejudgment interest; and ordering Tzolov and Butler to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

6. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

7. Venue is proper in the Southern District of New York under Section 22(a) of the Securities Act [15 U.S.C. § 77v] because Tzolov and Butler may be found in or are inhabitants of this district and offerings and sales of securities took place in this district. Venue is proper in the Southern District of New York under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business constituting the violations alleged in this Complaint occurred in this district, and Tzolov and Butler may be found in this district, or are inhabitants of this district, or transact business in this district.

8. Tzolov and Butler, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

**DEFENDANTS**

9. **Julian T. Tzolov**, 35, is a resident of New York, NY. From November 2003 until September 2007, Tzolov was a registered representative associated with Credit Suisse who held the corporate titles first of Vice President and then of Director. During that time he worked at Credit Suisse's Manhattan offices.

10. **Eric S. Butler**, 36, is a resident of New York, NY. From November 2003 until September 2007, Butler was a registered representative associated with Credit Suisse who held the corporate titles first of Vice President and then of Director. During that time he worked at Credit Suisse's Manhattan offices.

**FACTS**

11. From at least February 2005 through August 2007, Tzolov and Butler made unauthorized purchases of non-student loan asset backed auction rate securities for the accounts of corporate customers that had authorized Tzolov and Butler to purchase only auction rate securities collateralized by federally guaranteed student loans (the "Customers"). Ignoring the Customers' instructions, Tzolov and Butler purchased auction rate securities collateralized by a wide variety of collateral other than federally guaranteed student loans, including subprime mortgages, CDOs, and corporate bonds.

12. Tzolov and Butler knew or recklessly disregarded that the Customers had not authorized the purchases of non-student loan backed auction rate securities for the Customers' accounts.

13. Tzolov and Butler concealed from the Customers unauthorized purchases in the Customers' accounts of auction rate securities collateralized by assets other than federally guaranteed student loans. In particular, Tzolov and Butler sent or directed others to send to

Customers e-mails that added terms like "student loan" and "education" to the names of non-student loan backed securities purchased by the Customers, and that deleted from the names of non-student loan backed securities words like "CDO" or "Mortgage" that would reveal the unauthorized purchases.

14.  The misrepresentations and omissions Tzolov and Butler made in these e-mails were material in that they concerned the nature of the securities Tzolov and Butler purchased for their Customers and assets collateralizing them.

15.  Tzolov and Butler knew or recklessly disregarded that these e-mails falsely described the securities purchased for the Customers' accounts.

Auction Rate Securities

16.  Auction rate securities are bonds or preferred stock for which the yield is set periodically through a "Dutch auction" at which potential investors submit bids indicating the lowest yield at which the investor would be willing to buy the securities. The yield on the securities is then set at the lowest rate sufficient to sell all the securities being sold at the auction. The auction rate securities purchased by Tzolov and Butler for the Customers typically had auctions every 7, 28, or 35 days.

17.  Holders of auction rate securities can enter orders to sell them at the next periodic auction. If not enough bids are received to purchase all the securities being offered at auction, the auction is said to have failed, and customer sell orders are not executed.

18.  Some auction rate securities are asset backed instruments. Such asset backed auction rate securities can be collateralized by many different kinds of collateral, including corporate bonds and other instruments such as federally guaranteed student loans. The collateral can also include subprime mortgages, mobile home contracts, and CDOs. The securities promoted

by Tzolov and Butler to the Customers purportedly were auction rate securities collateralized exclusively by federally guaranteed student loans.

19. Beginning in August 2007, liquidity evaporated for auction rate securities whose collateral was not federally guaranteed student loans when auctions for these securities began to fail.

Credit Suisse's Corporate Cash Management Group

20. During the period from at least February 2005 through August 2007, Tzolov and Butler headed a group at Credit Suisse called the Corporate Cash Management Group (the "Cash Management Group").

21. During that period, the Cash Management Group consisted of Tzolov, Butler, and two to four sales assistants who worked under Tzolov and Butler's supervision.

22. One of the duties Tzolov and Butler assigned to sales assistants was to send e-mails to Customers describing transactions in Customers' accounts. Tzolov and Butler closely monitored the e-mails sent by the sales assistants and also personally prepared and sent such e-mails to Customers. Sales assistants obtained the information to include in e-mails sent to Customers from documents created by Tzolov and Butler.

23. Tzolov and Butler collaborated closely in managing the Cash Management Group and in servicing the Cash Management Group's customers. A portion of the commissions generated in the accounts of the Cash Management Group's customers was retained by Credit Suisse. The remainder was shared equally by Tzolov and Butler.

24. When Tzolov or Butler purchased an auction rate security for a Cash Management Group customer, Credit Suisse received a commission from the dealer selling that security. The selling dealers also paid a commission to Credit Suisse when one of Tzolov and Butler's customers

continued to hold, or "rolled over," an auction rate investment through a periodic auction. The commissions paid with respect to the purchase or roll over of non-student loan backed auction rate securities were significantly higher than the commissions paid with respect to the purchase or roll over of federally guaranteed student loan backed auction rate securities.

25.     Some of the unauthorized sales of auction rate securities to Customers were riskless principal transactions in which Credit Suisse purchased a block of auction rate securities through a proprietary account and then sold the securities to the Customers.

The Customers

26.     The Customers opened accounts at Credit Suisse in order to make short term investments of corporate cash.

27.     The Customers' primary investment objectives were preservation of principal and liquidity because they wanted the corporate cash they were investing to be readily available for corporate purposes. The Customers did not want to make investments that risked loss of principal or loss of liquidity. The Customers made their investment objectives known to Tzolov and Butler.

28.     Tzolov and Butler used marketing materials to solicit Customers to invest in auction rate securities backed by federally guaranteed student loans. In these materials, Tzolov and Butler described the auction rate securities market as consisting of "student loan issues, whose underlying loans are guaranteed by the US Department of Education." Tzolov and Butler's promotional materials stated that, due to the federal government guarantee of principal and accrued interest on the student loan collateral, "student loan paper has perhaps the highest quality and liquidity in the [asset backed securities] market. . . . Student Loan issues are widely viewed by market participants as perhaps the most creditworthy and liquid [asset backed securities] investment." In their marketing materials, Tzolov and Butler touted federally guaranteed student

7

loan backed auction rate securities as higher yielding alternatives to "Money Market Funds, Commercial Paper, Bank Deposits and Repurchase Agreements."

29. Tzolov and Butler's Customers authorized them to purchase only federally guaranteed student loan backed auction rate securities. Tzolov and Butler knew, or recklessly disregarded, that these Customers had not authorized – and did not want – Tzolov and Butler to invest in auction rate securities backed by any other collateral. Tzolov and Butler also knew, or recklessly disregarded, that purchases of non-student loan backed auction rate securities were inconsistent with some Customers' investment policies.

30. Tzolov and Butler did not have discretionary trading authority over the Customers' accounts. However, the Customers permitted Tzolov and Butler to select the particular federally guaranteed student loan backed auction rate securities in which the Customers' cash would be invested. Generally, a Customer's cash manager would notify Tzolov or Butler that the Customer had a certain quantity of cash to invest on a certain day. Tzolov or Butler would then purchase an auction rate instrument for the Customer's account and inform the Customer of the investment that day by e-mail.

31. The Customers, which often were based abroad, relied upon Tzolov and Butler and the Customers' cash managers used the emails received from the Cash Management Group to report internally the Customers' liquid investments and cash balances.

Unauthorized Purchases and Fraudulent Concealment

32. While Tzolov and Butler sometimes purchased student loan backed auction rate securities for Customers' accounts, Tzolov and Butler also purchased over $1 billion of non-student loan backed auction rate securities for these accounts. They did so notwithstanding the fact

8

that the Customers had authorized them to purchase only those auction rate securities collateralized by federally guaranteed student loans.

33. In many cases, Tzolov and Butler concealed that they were making unauthorized purchases by sending or directing others to send to Customers e-mails that falsely described non-student loan backed auction rate securities purchased for the Customers' accounts as student loan backed auction rate securities. Tzolov and Butler knew or recklessly disregarded that the e-mails falsely described the securities they had purchased for the Customers' accounts. Tzolov's and Butler's misrepresentations and omissions were material in that they concerned the nature of the securities Tzolov and Butler purchased for the Customers' accounts and the assets collateralizing them.

34. For example, on February 9, 2005, Butler purchased for the account of a Customer based in Canada ("Customer A") a $20 million security issued by Greenpoint Credit LLC that was backed by loans on mobile homes and not by federally guaranteed student loans. Butler sent Customer A an e-mail stating that Customer A had invested $20 million in a security issued by "Greenpoint Student Assistance." This alteration of the name of the security was a misrepresentation that was material in that it concerned the nature of the security Butler had purchased for Customer A's account and the assets collateralizing it.

35. On the next day, February 10, 2005, Butler purchased for Customer A $15 million of "Calamos Strategic Total Return Fund" preferred shares, and $10 million of "Glacier Funding CDO I Ltd" notes. Butler knew or recklessly disregarded that neither of these investments was a student loan backed auction rate security. Nevertheless, Butler falsely represented in an e-mail to Customer A that he had purchased $15 million in "Calamos Student Loan Authority" securities and $10 million in "Glacier Education Loan" securities. The alterations of the names of the

securities were misrepresentations that were material in that they concerned the nature of the securities Butler had purchased for Customer A and the assets collateralizing them.

36. Similarly, on June 19, 2006, Tzolov purchased for a Customer based in Switzerland ("Customer B") a $23.35 million auction rate CDO issued by South Coast Funding V Ltd., which was collateralized by subprime mortgages and other financial instruments. Tzolov knew or recklessly disregarded that this CDO was not a federally guaranteed student loan backed auction rate security. Nevertheless, Tzolov falsely described the security in an e-mail sent to Customer B as "South Coast Funding St. Loan." The alteration of the names of the security was a misrepresentation that was material in that it concerned the nature of the security Tzolov had purchased for Customer B and the assets collateralizing it.

37. On November 1, 2006, Tzolov purchased $90 million of Camber Trust securities for a Customer based in Bermuda ("Customer C") that had authorized the purchase only of auction rate securities collateralized by federally guaranteed student loans. Tzolov knew or recklessly disregarded that the Camber Trust securities were not federally guaranteed student loan backed instruments.

38. On December 1, 2006, Tzolov sent Customer C a list of Customer C's current holdings that falsely described the Camber investment as "Camber Funding St. Loan" and on May 21, 2007, Tzolov, in another e-mail to Customer C, referred to the Camber investment as "Camber Funding Student Loan." When Tzolov sent Customer C the list on December 1, 2006 and the email on May 21, 2007, Tzolov knew or recklessly disregarded that the Camber investment was not backed by federally guaranteed student loans. The alteration of the name of the security was a misrepresentation that was material in that it concerned the nature of the security Tzolov had purchased for Customer C and the assets collateralizing it.

39. From at least February 2005 through August 2007, Tzolov and Butler purchased over $1 billion dollars of non-student loan backed auction rate securities for Customers that had authorized purchases of only auction rate securities backed by federally guaranteed student loans. Tzolov and Butler sent or caused to be sent to these Customers over fifty e-mails that falsely described the non-student loan auction rate securities purchased for Customers as federally guaranteed student loan backed auction rate securities when Tzolov and Butler knew or recklessly disregarded that these auction rate securities were not backed by federally guaranteed student loans. The misrepresentations and omissions in these emails were material in that they concerned the nature of securities Tzolov and Butler had purchased for the Customers' accounts and the assets collateralizing them.

40. In at least thirty-six other instances, Tzolov and Butler fraudulently concealed their unauthorized purchases of non-student loan backed auction rate securities by sending or directing their sales assistants to send e-mails to Customers in which the names of securities were altered to omit the terms "CDO" and "Mortgage." In fact, Tzolov and Butler gave their sales assistants a blanket instruction not to use the term "CDO" in e-mails sent to Customers, and instead to substitute the term "Funding."

41. When Tzolov and Butler altered the names of the securities in e-mails to Customers or directed the sales assistants to do so, Tzolov and Butler knew or recklessly disregarded that these securities were not federally guaranteed student loan backed auction rate securities but they did not tell that to the Customers in the altered emails. These misrepresentations and omissions were material in that they concerned the nature of the securities Tzolov and Butler had purchased for Customers' accounts and the assets collateralizing them.

Tzolov and Butler Gave False Answers to Customer Inquiries

42. On at least two occasions, a Customer sent an e-mail asking whether a security that Tzolov and Butler had purchased for the Customer was a student loan backed security. In each instance, Tzolov knew or recklessly disregarded that the particular security was not backed by federally guaranteed student loans. Nevertheless, Tzolov falsely represented in an e-mail reply to the Customer that the security purchased for the Customer was a federally guaranteed student loan backed security when it was not. In one of those instances, Butler followed up with an e-mail to the client confirming Tzolov's misrepresentation.

43. On July 23, 2007, Customer C instructed Tzolov to invest $35 million in "college debt." Ignoring Customer C's instructions, Tzolov promptly purchased for Customer C's account $35 million in securities that he knew or recklessly disregarded were backed by subprime mortgages and other collateral and not by federally guaranteed student loans.

44. Later that day, Customer C e-mailed Tzolov and asked if the securities Tzolov had purchased were "US Government backed securit[ies]." In a reply e-mail to Customer C, also on July 23, 2007, Tzolov stated that "It's the same structure as all of the other bonds we buy for you. It's student loans packaged into trusts and the individual loans are guaranteed by the US Dept of Education . . . ." This statement was materially false and misleading, as Tzolov knew or recklessly disregarded. Not only were the securities Tzolov had purchased not backed by federally guaranteed student loans, but Tzolov and Butler also had previously made numerous unauthorized purchases of non-student loan backed auction rate securities in Customer C's account.

45. In July 2007, a Customer based in Panama ("Customer D") authorized Tzolov and Butler to invest $4 million in a federally guaranteed student loan backed auction rate security. Instead, Tzolov purchased a $4 million auction rate CDO issued by "Centre Square CDO Ltd."

12

Tzolov knew or recklessly disregarded that this CDO was not a federally guaranteed student loan backed auction rate security. Nevertheless, in an e-mail to Customer D from Tzolov, which he copied to Butler, Tzolov falsely described the issuer of the CDO as "Centre Square Funding." This misrepresentation was materially false and misleading in that it concerned the nature of the security Tzolov had purchased for Customer D and the assets collateralizing it.

46.    On July 25, 2007, Customer D asked Tzolov and Butler via e-mail if "Centre Square can be define[d] strictly as an Auction Rate Security – Student Loan." Tzolov, who knew or recklessly disregarded that the Centre Square CDO was not backed by federally guaranteed student loans, told Customer D in an e-mail copied to Butler that: "It's classified as Auction Rate Student Loan." This false and misleading statement was material in that it concerned the nature of the security Tzolov had purchased for Customer D and the assets collateralizing it.

47.    On July 26, 2007, Butler sent an e-mail to Customer D stating that "I want to reconfirm that the [Centre Square] security is an Auction Rate Security," without saying that the Centre Square security was backed by collateral other than federally guaranteed student loans. When Butler sent this email to Customer D, he knew or recklessly disregarded that the Centre Square CDO was backed by collateral other than federally guaranteed student loans, but Butler omitted to state this to Customer D in the email. Particularly in light of Tzolov's email to Customer D the day before, Butler's omission was material in that it concerned the nature of the security Tzolov had purchased for Customer D and the assets collateralizing it.

Auctions Fail for Non-Student Loan Backed Auction Rate Securities

48.    In August 2007, auctions began to fail for auction rate securities collateralized by subprime mortgages and other non-student loan collateral.

49.     In at least one instance, Butler concealed the auction failures from a Customer and as a result the Customer made another investment through Butler.

50.     On August 8, 2007, an auction failed for a $14.4 million Lakeside CDO held in the Customer A's account. Butler knew that the auction had failed but he did not inform Customer A about the auction failure. Instead, he told Customer A that due to an administrative error in filling out a trade ticket, Credit Suisse's compliance department prohibited the return of Customer A's principal at that time. This was a false and misleading statement, as Butler knew or recklessly disregarded. Butler's misrepresentation to Customer A was material in that knowledge of the auction failure would have affected Customer A's decision to purchase additional auction rate securities.

51.     Following the failed auction, Butler told Customer A that a new issue was available that would pay an attractive yield. Customer A had $25 million to invest, but Customer A would not have invested in any auction rate securities if Butler had told Customer A about the failed auction. Butler did not do so and instead used the new funds to purchase for Customer A another auction rate security that was not backed by federally guaranteed student loans. Subsequently, auctions failed for other non-student loan backed auction rate securities held in Customer A's account.

52.     After Customer A learned that auctions had failed for some of the auction rate securities in its account, Customer A instructed Credit Suisse to sell all the securities in its account. Credit Suisse was able to sell the federally guaranteed student loan auction rate securities held in Customer A's account, but was unable to sell the non-student loan auction rate securities.

53. The non-student loan backed auction rate securities purchased for Customer A's account by Tzolov and Butler that to date have not been sold had an aggregate purchase price of $132.5 million. These securities have suffered a steep decline in value since they were purchased.

54. In August 2007, Customer B instructed Credit Suisse to liquidate $200 million in securities in its account and to wire the proceeds to Customer B's bank. Because of auction failures in the non-student loan backed auction rate securities market, Credit Suisse was able to liquidate only about $63.5 million in securities in Customer B's account. At that time, Customer B learned that its account contained no federally guaranteed student loan backed auction rate securities and instructed Credit Suisse to liquidate the account.

55. To date, the non-student loan backed auction rate securities held in Customer B's account remain unsold. These securities had an aggregate purchase price of $415 million. These securities have suffered a steep decline in value since they were purchased.

56. Following the auctions failures in August 2007 in the non-student loan backed auction rate securities market, Customer C instructed Credit Suisse to sell the auction rate securities it held that had been purchased by Credit Suisse for Customer C. To date, Credit Suisse has been unable to sell the bulk of the non-student loan auction rate securities held by Customer C.

57. Customer C's current portfolio of non-student loan backed auction rate securities purchased by Tzolov and Butler had an aggregate purchase price of $270,250,000. These securities have suffered a steep decline in value since they were purchased.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

58. The Commission realleges and incorporates paragraphs 1 through 57 by reference as if fully set forth herein.

59.  The auction rate securities purchased by Tzolov and Butler for Customers' account are securities within the meaning of Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

60.  Tzolov and Butler, directly or indirectly, singly or in concert, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) have employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; (b) have made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) have engaged, are engaging, or are about to engage in transactions, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon the purchasers of securities.

61.  By reason of the foregoing, Tzolov and Butler, singly or in concert, directly or indirectly, have violated, or are violating, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

62.  The Commission realleges and incorporates paragraphs 1 through 61 by reference as if fully set forth herein.

63.  Tzolov and Butler, directly or indirectly, singly or in concert, in connection with the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange: (a) have employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; (b) have made, are making, or are about to make untrue statements of material fact, or have omitted, are omitting, or are about to omit to state material facts necessary in order to make

16

statements made, in light of the circumstances under which they were made, not misleading; and/or (c) have engaged, are engaging, or are about to engage in acts, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon other persons.

64.    By reason of the foregoing, Tzolov and Butler, singly or in concert, directly or indirectly, have violated, or are violating, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests the Court to enter a Final Judgment:

**I.**

Permanently restraining and enjoining Tzolov and Butler from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5];

**II.**

Ordering Tzolov and Butler jointly and severally to disgorge their ill-gotten gains, if any, plus prejudgment interest;

**III.**

Ordering Tzolov and Butler to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## IV.

Granting such other relief as this Court may deem just and proper.

Dated: New York, New York
September 3, 2008

By: /s/ Andrew M. Calamari
ANDREW M. CALAMARI
ASSOCIATE REGIONAL DIRECTOR
SECURITIES AND EXCHANGE
COMMISSION
3 World Financial Center
New York, NY 10281
(212) 336-0174
Attorney for Plaintiff

Of Counsel:
Robert J. Keyes
Ken C. Joseph
David Stoelting
Eric M. Schmidt